May it please the Court, Christine Schiml, State Attorney General, Counsel for the Appellant, Edward Alameda, Jr. Your Honor, this Court should reverse the District Court's judgment because habeas relief was not warranted for the appellee. The State Court's merits determination of the appellee's cruel and unusual punishment claim was not and did not involve an unreasonable application of U.S. Supreme Court precedent. The recent U.S. Supreme Court decision of Lockyer v. Andrade is dispositive of this issue. In Lockyer v. Andrade, the U.S. Supreme Court made clear that the only governing legal principle that was clearly established was the fact that there was a gross disproportionality  However, the U.S. Supreme Court also made clear that the application and the contours of that principle were unclear. Based on Lockyer v. Andrade, the appellant would respectfully request that this Court reverse the District Court's judgment, reinstate the State Court judgment in order that it be enforced forthwith. Well, Andrade establishes there is a governing principle, right? Gross disproportion is cruel and unusual. Yes, Your Honor. Lockyer v. Andrade does make clear that there is a gross disproportionality analysis. And how do we go about determining that? Well, Your Honor, unfortunately, the U.S. Supreme Court has indicated that the application and the contours of that principle are not clear. And U.S. Supreme Court, I believe, has not really made that clear. So in terms of the actual principle itself, the U.S. Supreme Court did say that it is up to the legislatures, the State legislatures, to determine. It's within the legislature's discretion in terms of how to interpret that gross disproportionality principle. Well, hasn't the State of California done that by making much less penalties for much more serious crimes? Do you know what the penalty for rape is? I don't know the exact penalties right offhand, Your Honor. I don't. How about voluntary manslaughter? Voluntary manslaughter is, I believe, I believe it's 15 to life minimum. You're wrong, but anyway, you can kill somebody, you can rape somebody, and you'll get a far less of a penalty than you will for shoplifting. Well, I'm sorry. Even doing it three times. Well, Your Honor, I. Isn't that? That's the objective test that seems to me there. The legislature has made that determination. Oh, you're right, Your Honor. Yes, the legislature has made clear and has decided that recidivists under the three-strikes law, and I believe the people of the State of California because the three-strikes law in California came about by both ballot initiative and by the State legislature's actions. So the State legislature and the people of the State of California have made clear that, yes, recidivists will be punished more severely. Well, technically, you can work it out, but I'm sure you got the thrust of my question to the representative of the United States. Lawyers are not to be mere technicians. You ought to think a little bit about policy. What's the policy of the current district attorney of Los Angeles County? Oh, well, Your Honor, I'm not sure about the district attorney of Los Angeles County. You haven't read about that in the paper? No, Your Honor. No, you just don't read the paper? I'm sorry, Your Honor. No, I didn't. I was busy preparing for this, and I don't live in Los Angeles. Wasn't there a campaign for district attorney? Oh, I'm sorry? Wasn't there a campaign for district attorney where his policy was made clear? For the Los Angeles? Yes. Your Honor. That was unknown. I'm sorry. I'm not familiar with that. There are signs as to what the people, at least in this part of the state, think. Well, the people of the state of California and the legislature have made clear that recidivism is dangerous and poses a serious danger. Well, what is the danger in somebody who is not a residential burglar but shoplifts at convenience stores? Oh, well. What is the danger? The danger is that, well, Your Honor, burglary and other theft-related crimes, they can lead to serious danger because we don't What is the crime here? The crime was two instances of shoplifting, a Kmart and a Lucky Store, and then this bizarre lifting of a, what was it, a VCR? Walking out of the store with everybody looking at him in broad daylight, and, you know, he got caught for that. So we have these three really, truly minor crimes. I guess what I'm looking at it is what is the way I'm looking at it, and just so you know, the district attorney of Los Angeles does not bring three-strike suits. That's his policy. Oh, okay. Just so you know. And we are in Los Angeles because, and he got elected on that platform saying that he wouldn't. That's what we're talking about. So now what I'm asking you, since you are a representative of our state, and maybe you might want to take this back to Mr. Locke here, I'm asking you, what is the state's interest in putting this man back in prison for life when you're going to have to pay the jail costs and all of that, and you have this man, you have a record that he's been out or out of prison now for, what, over a year? And there's been no shoplifting, no evidence of any crime. He's got all these letters saying what a great citizen he is. Why does the state want to take this man and put him in jail? I don't understand what Mr. Locke's interest is in that. Well, Your Honor, if I may, hopefully I can answer all your questions. Mr. Locke, your interest is in upholding the laws of the State of California. The laws of the State of California, as determined by the California legislature and by the people of the State of California by ballot initiative, has been to punish recidivists more severely. I don't know. I just saw him drop a cert petition in front of the Supreme Court because he was being pressured by disability groups. And he was the law, and you're well aware of that one, aren't you? Yes, Your Honor. Mr. Locke is pretty clear on that. And he dropped his whole legal argument that he had on behalf of the State of California because he didn't want to offend disability groups. So I don't understand why he doesn't have, which he does as the State Attorney General, the discretion to make decisions about which cases he's going to prosecute all the way and get this guy back in jail for life and which cases he's going to say, you know, this is an unusual case. This man's been out. He lives a good life. He's a productive member of society now. There's not really any evidence since he's been out of recidivism whatsoever. Maybe we just made a mistake putting him in prison all this for, you know, for life. Your Honor, if I may address your comment, if I may respond. The appellee in this case, first of all, they weren't just two shoplifting back in 1991. They were two robberies. The force was used in those, both those incidents. The criminal force. I know you say force was used. But one, it was the car accidentally ran over the foot. The getaway car accidentally ran over the foot of someone. And the other one, the other so-called force was pushing a person just out of the way as he ran out. That's the force. I mean, we're not talking about someone who's going in there to commit a violent crime. Well, Your Honor, he has had a history throughout. His criminal history shows that he repeatedly and consistently after some time goes back to going back to theft-related crimes. And he's got those two prior serious and violent felonies. And I see that my time is running out. Let me ask you about something. But I just want to finish addressing your question but reserve some time for rebuttal. Let me ask you about something. Yes, Your Honor. When I was in practice, I used to get really bothered by sentencing policy sometimes because it seemed like when I did criminal defense, my clients didn't get punished much for hurting people. But they got very severely punished if they offended the court by doing what they promised the court they wouldn't do again. And that was really the motivation for the harshness toward recidivism. It was that the probation officer felt like he'd been galled if he'd given my client a break and then my client reoffended. It was more like offending the court was a bigger deal than hurting somebody. That's wrong, just flat morally wrong. And, you know, none of us are immune from that kind of concern. However, I have a real hard time distinguishing this case from Andrade where the guy just shoplifted $150 worth of videotapes. And I'm wondering, is there any value in this case to deferring submission and giving you a chance to talk with opposing counsel? Or are you just like the lawyer in the last case, no authority, waste of time? Well, Your Honor, I believe that the authority is under Lockyer v. Andrade, which is that even if this court ---- No, you didn't understand what I said. Well ---- When I say authority, I mean authority to negotiate as opposed to legal authority, which we must follow as precedent. You might have noticed that you didn't have to argue to me that Andrade was good authority for your position because I just said to you Andrade was good authority for your position. Well, Your Honor, I don't believe that I ---- hopefully I can answer your question. I don't believe that I have the authority to enter into discussions with opposing counsel. We are asking this court. There is clear precedent, and we do believe that this ---- Well, I'd like to ask you to go back to Mr. Lockyer and tell him that I asked you to do it and tell him, ask him whether he would give you some authority to negotiate this case based on Mr. Ramirez's conduct since being released from prison. Have you done that yet? In terms of going to address Mr. Lockyer himself regarding ---- Yes. Have you talked to your supervisors about what's been going on since Mr. Ramirez has been released from prison? I have spoken with my supervisors, and, yes, we have ---- How far up have you gone? How far have I gone? I've gone up to our Chief Assistant Attorney General. Well, I'd like you to go to Mr. Lockyer and tell him I sent you. Yes, Your Honor. I will certainly do that. And then we will discuss whether we defer submission of this matter in our conference. But you have some time to talk to Mr. Lockyer. I will certainly do that. Because I'm really hopeful that as these Andrade cases proceed, as we've been getting them, that the Attorney General of the State of California will think very carefully about the policies of enforcement across the board without regard to the specific individual characteristics, as well as I'd like you to inform yourself of what comparative sentences are. The questions Judge Noonan was asking you? Yes, Your Honor. Find out. Find out. You should know that. You're an attorney for the State of California. You should know that. Just find out. I understand you're not the highest up person and that you're not charged with knowing all this, but I would like to ask you to do that. Yes, Your Honor. I will certainly take that. Counsel, I have one more thing. Oh, go ahead. How long have you been representing law enforcement? I've been working in the criminal division for about, I'd say, five years. And you are aware that district attorneys don't charge every crime at the max, are you not? Yes, Your Honor. And you're aware that sometimes district attorneys exercise discretion and don't charge what they could charge? That's a standard practice, is it not? I would imagine, yes, Your Honor. You would imagine. You know, don't you? Well, yes. So the interest in enforcing the law that you referred to as the great interest that you're representing, is not an interest in enforcing every law to the max. It just isn't. Nobody does it. No district attorney does it. You use discretion. And what we're suggesting to you now is discretion is appropriate here. And the attorney general, if you have to go that high, is the person to exercise it. You get the picture? Yes, Your Honor, I do. And I understand. And with Judge Wardlaw's request, I will certainly speak with Mr. Lockyer. But however, I do – Can you reach him? Can you get access? Well, I can try, Your Honor. Well, can you say it? That the two members of the Court said you ought to go to the attorney general? Well, based on your request, I will certainly do whatever I can to speak with Mr. Lockyer. We don't want you, you know, your immediate chief. Yes. We want you to go all the way. Absolutely, Your Honor. Yes, I will. I will do my very best to get a hold of Mr. Lockyer. But I would resubmit that at this date and in this case, Mr. Ramirez, the appellee, is not entitled to hate this relief. Mr. Lockyer won't meet with you about this case upon the request of two Ninth Circuit judges? Oh, I'm sure he will. As soon as I ask him, I'm sure he will. You will meet with him and that you will discuss these policy concerns with him? I will. All right. Thank you. Counsel, I have an additional remark I want to make to you. First of all, my colleagues mentioned, too, and, you know, we all act independently. We do not necessarily share the same views. One concern that I would have representing an institutional litigant, one concern I did have when I did represent institutional litigants, is the generation of bad precedent from an appellate tribunal.  The second thing that I want to tell you, and this is very important, get from the clerk a tape of today's proceedings, play it back for yourself, and then when you talk to Mr. Lockyer and whatever other supervisors you talk to, play the tape so that they are not dependent on your understanding of what took place and are able to form judgments based on a firsthand familiarity with what my colleagues have said. Yes, Your Honor. And what I have said. Yes. The tape is easily available, and it's very important that you obtain it. Yes, Your Honor. Can she have the tape today? You can take it with you when you leave. If I may just reserve at least one minute for rebuttal for later. Actually. I was hoping I could. We may allow time for rebuttal, but there's nothing to reserve. You're way over time. So we probably will not. Thank you, Your Honor. Counsel. It is true that the Court has made unclear Nandrati and still the. Is there any way that you can. It looked to me as though the district court followed the Ninth Circuit decision in Nandrati. Correct. And then the Supreme Court said that the Ninth Circuit decision in Nandrati was wrong. The defendant in Nandrati sold $150 worth of videotapes. How do we distinguish Nandrati? We distinguish Nandrati from my case, Your Honor. Yes. Okay. Nandrati. First of all, Nandrati has more prison priors than I do. Number one. He was on parole. What he committed to, if I believe, he committed two additional crimes. Is there enough of a difference so that the State court was clearly acting clearly contrary to Supreme Court authority? I believe that there is. I strongly believe that there is a difference to where the Supreme Court would take a look. I mean, it would. I mean, your fellow's priors, if you look at the conduct, it's not as aggravated as you see in a lot of cases. But the classifications are serious. Right. Right. As I said, Your Honor, the prison terms that Nandrati had was numerous. And while he was out on parole, he had committed two additional paid disciplinary charges. I think the clear fact is he was a heroin addict, as Justice O'Connor makes plain. She gave all the background that made him seem like a very dangerous man. Right. A heroin addict who hadn't beaten his habit, who'd go right on stealing in order to defeat him. So it's a very different position from you. Right. Additional to that, Your Honors, I believe that the threat to society is not valid because I've been released as well. I strongly believe that I was never a threat to society and that where the State has applied to. I strongly believe that, yes, I was a criminal and, yes, I did some wrongdoing. And I believe that I should have and should pay for those crimes. And I admitted to the petty theft that I had committed without a doubt. And as I said, I strongly believe that I should be punished for that. And you certainly can see the dangers that were created when you ran and when the getaway car ran over somebody's foot. Yes. That was quite a danger. Yes. Yes. That was, you know, I thank God that nobody got hurt in that. Well, somebody did get hurt, didn't they? Well, no. Actually, it was an attempt. Oh. Yeah. There was no ambulance call. There was no. So the guy's foot was not. No. No, there was nothing there. It was. And eventually some of these crimes were, they were charging decisions. Yes. They were charging decisions. And you. What superior court? What county? It was Orange County Court. It was the Orange County DA made these charging decisions at the higher crime level than, I mean, it could have been. Were they wobbly? No. They were wobbly offenses, Your Honor. When I took the plea, I was arrested for them a year later. And when I was taken into custody a year later for them, I admitted to the crimes. And. You did them both on the same day? No. No, they were. Oh, you pledged. I pledged to them a year later. Correct. And the judge was understanding at the time, at that particular time, I did have a drug problem. And he had ordered a, he ordered me to serve one year county jail, which I served six years and 20 days with quit time, and then ordered that I have some rehabilitation and follow up on psychiatric. In six months? Pardon me? You served in county jail? I served county jail six months and 20 days, which is the most term that I did. And how long were you in prison before you were released under the. . . I was in prison for six years, Your Honor. Six years. Are you getting all this down? And I was, it was my. . . Including the threat to society in the six years already served? At the point in time, prior to the five years, there was no contact with the police. Six years while I was in prison, I had no write-ups. I was quite, I was quite a model. I was even a representative, M.A.C. representative for the yard. And we, this was an established job performance. I was a model inmate, never wrote up or nothing. No, it's certainly very sad that you got back into the, doing it. And I'm sure this lesson just has to be imprinted on you. Never to do anything like that again. Oh, yeah. Yeah, I mean, it was, the impact was not just for me, but the impact to see my family, my wife, my girls, and, you know, the rest of my family, and to see what I had put them through as well was tremendous. And under this law, you're placed, you're given 25 years to life. They placed you on a four-level prison. For somebody who has never been to prison before, and, you know, it was quite a shocking experience. And there's a healing period as well. There's a healing period in that. I guess the State's concern must be, well, some people, the crimes individually may not be the most serious. It's not like rape, robbery, murder, though in your case it was technically robbery. It was, yeah. But still, we get some people that just won't stop doing them. So what else are we going to do? And how, what response can you make to that? I would strongly believe that there's, you know, as a recidivist, for a person who does, you know, two or three, I honestly feel in my heart that they should be, you know, more of a sentence than one individual who has done it for the first time. But when you compare it to other crimes, as you mentioned earlier, like manslaughter and more serious crimes of violence, it's absurd. It's absurd. And, you know, I have to say that there's many like me in prison I've run across. You know, and you hear some of their cases, and some of them are not, you know, they weren't as blessed as I was. You mean what's called robbery, there's no gun or knife. Yeah, there's no gun. Because actually, my robbery was not considered a 2-11. My robbery was considered a 2-12.5-213, which is a lesser degree. So it was more of resistant arrest. And the court, the court recognized that. But the agreement and the plea bargain that I had taken at the time, it was robbery for 2-12. So at the time you did the shoplifting, you had a drug problem? At the two previous ones, yeah, in 1990 and 1991, correct, I was in a bad relationship. I had, I was in care of two of my boys and wasn't working. And the mother at the time had left. And we were both utilizing and we were, I was drinking considerably. How long have you been clean? Honestly speaking, I would say from today, it has to be at least since 1994. So almost a decade. Yeah. Because of the six years in prison. Yeah, oh yeah, yeah. I mean, to wake up every morning in prison, you know, you're never going to get out. And it was something. It was a life experience. Well, some of the purposes of putting people in prison is, and one of the principal purposes is rehabilitation. You know, and I'm glad that you mentioned that because that's true. It's, you know, I remember you watch movies and, you know, you see prison movies and you see the rehabilitation techniques, and I never seen any of that. And even upon my release, and I have to say now that one of the major factors of my life was I had to turn this court over, you know, aside from this, but I had to turn my life over to the Lord. And so there's a spiritual thing right there for me that where I had, you know, Christian character come into my life and play and healing, and that's what I've been dependent upon. My wife was also a Christian. She turned into a Christian. So I had much support from her. Without her, it would have been very difficult as well. I had much support from the pastors of the church that I attend and work for now. Are they here today? They're here today, Your Honor. Which ones are they? I have Pastor Jim. I have, again, I have a pastor here. Wave your hand. I have a gentleman here that I just received another letter from. You have quite a group here. Thank you for coming to support him. Yeah. One of them is he participates in MACS back there as well. He has an Orange County Home for Men that he has developed for men coming out of prison. His wife also has a woman's home. And we're all affected by this in a lot of ways. It's just not me. It's just they deal with inmates coming out of prison all the time. And we all believe the same thing, that justice will prevail on this. And I feel that I honestly feel that the wrong cases were presented for this issue. And I don't think that the door should close. I think that the door should remain open. My former law clerk who clerked on the Supreme Court when the cert petitions were granted said that they viewed them as some of the more extreme cases. Right. I'm not sure I understand that. Well, you're right. They are very extreme cases of recidivism. Yeah. The cases that went to the Supreme Court. Right, Andrade and Ewing. Yeah. There were just, there were, you know, much of them had over more than four, more than four. And actually today, the Attorney General, she hasn't had an opportunity to see what I've accomplished in this last year. If this Court would allow, I would love to have a couple of them stand just for a minute and just give. We don't do that in appellate courts. All right. Your time is up. And thank you. I had been thinking that you were represented. I hadn't realized you were pro se, but you've done a fine job for yourself. Thank you, Your Honor. Thank you. Thank you. Counsel, you have no time, but I'll give you 30 seconds. I promise I will make it one sentence very briefly, Your Honors. I would resubmit that under the precedent, Mr. Ramirez, the appellee is not entitled to habeas relief, and we would ask that this Court respectfully, we request that this Court reverse the district court's judgment, reinstate the State court judgment in order that it be enforced forthwith. Thank you. Thank you, Counsel. Thank you. We will determine in conference when to submit Ramirez v. Castro. It is not submitted at this time. Argument in Ramirez v. Castro is concluded, and we are adjourned.
judges: Noonan, Kleinfeld, Wardlaw